IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MEGAN LINCOLN,**                                      Case No. 5:15 CV 2354

    Plaintiff,                                      Judge John R. Adams

    v.                                             Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                     REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff, Megan Lincoln ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI on August 1, 2012, alleging a disability onset date of September 1, 2008. (Tr. 209-21). Her claim was denied initially and upon reconsideration. (Tr. 142-55, 158-70). Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ"). (Tr. 171-72). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 10, 2014 in Akron, Ohio. (Tr. 46-79). In a written decision on August 1, 2014, the ALJ found Plaintiff not disabled. (Tr. 22-45). The Appeals Council denied Plaintiff's request for review, making the hearing decision

the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed

the instant action on November 17, 2015. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was born August 10, 1984, making her twenty-nine years old at the time of the

hearing, and twenty-four at her alleged onset date. (Tr. 52-53). She had completed two years of

college (Tr. 53), lived with her parents, sister, and son (Tr. 66), and was able to drive (Tr. 53).

Plaintiff estimated she could stand for about 20 to 30 minutes before feeling pressure in her

lower back and sciatic pain down her left leg, and walk for 15 to 20 minutes before needing to

rest. (Tr. 63). She can sit for two hours at a time, but may become stiff and need help to get up.

(Tr. 64). She has difficulty bending, stooping, and squatting due to pain in her back and pressure

in her head. (Tr. 63-64). Plaintiff did not believe she could lift 20 pounds. (Tr. 64).

In response to questioning about her daily activities, Plaintiff testified she cooks simple

meals for her four-year-old son for breakfast and lunch. (Tr. 66). She testified her mom helps

her, and that her son's father "usually comes daily and helps in the afternoon." *Id.* When asked

whether she does laundry, she replied:

> If there was something that needed done right now I usually will try to muster
> through a small load and [her son] is really great now, you know, he likes to help
> so he'll help me bend and get things out of the dryer. If there's heavy laundry that
> needs done my mom and sister help when they get home.

(Tr. 67). She stated she does go grocery shopping, but does not help with housework. (Tr. 68).

Regarding her daily activities, Plaintiff stated:

> With my son[,] we'll wake up and I'm very stiff in the mornings and it will
> usually take me maybe 20 minutes to a half hour to really get going and he's so
> patient he'll sit and read his books, you know, and I just talk to him . . . about
> what we're going to do that day. He'll pick out what he wants to wear. I get him
> dressed and when I'm finally able to get moving we'll go downstairs, help him

2

> get breakfast. If I'm having a very bad day I'll sit so I can help him do puzzles or color. [Right] now he's working on writing his letters. If it's a very, very bad day I usually will call my mom and thankfully for her flexibility and my sister's she works midnights she's able to take him outside, you know, or especially since it's summertime and they'll play while I try to rest.

(Tr. 68-69).

Plaintiff testified to going shopping with her son's father at least once a week, and attending her doctor's appointments. (Tr. 69). She does "[n]ot usually" grocery shop alone, but would "run in and . . . just get milk" if necessary. (Tr. 73). She stated she is unable to lift heavier groceries because of her joint pain, numbness, shoulder surgery, and shoulder spurs. *Id.* Plaintiff testified her son weighs 42 pounds and she does not lift him. *Id.*

Plaintiff testified she could not work five days a week and would be absent from a job more than three or four days per month. (Tr. 64-65). Plaintiff testified her condition has "culminated and worsened over the years and created . . . a situation where it wouldn't be probable or plausible for [her] to sustain work" because of her joint and back pain, stiffness, pressure in her head, painful psoriatic rashes, fatigue, and elevated cortisol levels. (Tr. 55-56). She said she has had elevated cortisol levels dating back to 2002 or 2003 and doctors have told her she has a rare form of Cushing's disease where the levels cycle between high and low. (Tr. 56). When levels are high, she has heart palpitations, migraines, anxiety, and difficulty sleeping. *Id.* When levels are low, she is fatigued and has "brain fog." (Tr. 56-57).

Plaintiff testified she had left rotator cuff surgery and cannot lift her left arm straight overhead, but can reach out in front. (Tr. 57). She also testified to spurs in her right shoulder which cause pain in certain positions and numbness and tingling in her fingers. (Tr. 57-58)

Regarding her asthma, Plaintiff testified during and after her upper respiratory infections, she is "constantly using her inhaler" and gets short of breath going up stairs, and is bothered by

strong scents. (Tr. 58-59). Plaintiff also testified she had bronchitis or infections confining her to bed "if not monthly every other month". (Tr. 71). Plaintiff stated she seeks medical care if she has been sick for four or five days and the over-the-counter medications do not work. (Tr. 72).

Regarding her psoriasis, Plaintiff testified her rash is "constant" and was "spreading" at the time of the hearing. (Tr. 59). It was on her face, scalp, behind her ears, back of her neck, her trunk, and the top part of her legs at the time of the hearing. (Tr. 70). She stated it always feels "hot and burning." *Id.* She stated there wasn't anything she could do for it at the time of the hearing "because of the test study" and "even the topical creams don't alleviate all of the pain." (Tr. 71). She stated over time, the rash has spread and gotten more painful. *Id.*

Regarding her pseudotumor cerebri, Plaintiff testified that bending down to pick something up, she feels pressure at the top of her head, which causes dizziness and nausea and she has to sit down for 10 to 15 minutes. (Tr. 60). Plaintiff testified she has "learned to adapt and modify what [she does] physically so as not to aggravate it further." (Tr. 60-61). Pushing and pulling, like running a vacuum cleaner, cause the same effects. (Tr. 61). She tried a medication to relieve the pressure, but suffered side effects so no longer takes it. *Id.* Spinal taps had been temporarily effective in relieving the symptoms. (Tr. 62).

Overall, Plaintiff testified she has one to two good days per week. (Tr. 74).

***Relevant Medical Evidence***

### ***Prior to 2010***

In December 2007, Plaintiff sought treatment at Aultman Hospital Immediate Care West Stark ("Aultman") for bronchitis. (Tr. 560).

In June 2008, emergency room doctors at Aultman diagnosed Plaintiff with acute sinusitis. (Tr. 549-52).

4

In July 2009, Plaintiff was diagnosed with a urinary tract infection. (Tr. 555).

An MRI of Plaintiff's cervical spine in July 2009 showed no evidence of disk herniation and questionable right-sided neural canal stenosis at T1-2. (Tr. 917-18).

***2010***

In August 2010, Plaintiff was diagnosed with bronchitis in the emergency room at Aultman. (Tr. 531).

In October 2010, Plaintiff was diagnosed with an early urinary tract infection. (Tr. 504).

In December 2010, emergency room doctors at Aultman diagnosed Plaintiff with sinusitis, bronchitis, rash to face, and fatigue. (Tr. 467-70).

***2011***

In March 2011, Plaintiff sought to establish care with Steven Nam, M.D. (Tr. 731-32). She reported fatigue, joint pain, and weight gain beginning after a hospitalization from a few years prior for a viral illness in which she was treated with corticosteroids. (Tr. 731). Plaintiff reported a past workup with endocrinologists and rheumatologists. *Id.* Dr. Nam noted moon facies and obesity, and described Plaintiff as having obvious Cushinoid features. (Tr. 731-32).

In April 2011, after reviewing Plaintiff's records, Dr. Nam noted "a complex history with workup of various non-specific complaints of fatigue, multiple pain complaints, facial rash, paresthesias, [and] weight gain." (Tr. 727). Plaintiff reported she had recently been doing well—exercising, lost weight, increased energy, rash resolved—but then began to feel worse—weight re-gained, rash recurred. *Id.*

In June 2011, Plaintiff returned to Dr. Nam reporting frustration with regard to her symptoms, stating she has "good days and bad days". (Tr. 725). Plaintiff's cortisol test was

modestly elevated, but the confirmatory late-night salivary test was negative. *Id.*; *see also* Tr. 734-36. Dr. Nam suggested an endocrinology consult if symptoms did not improve. (Tr. 726).

In September 2011, emergency room doctors diagnosed Plaintiff with recurrent bronchitis and an ear infection. (Tr. 458-61).

In October 2011, emergency room doctors diagnosed Plaintiff with bronchitis and a history of asthma. (Tr. 457). She also had an abscess behind her left ear drained. *Id.*

In December 2011, Plaintiff reported to the emergency room complaining of chest pain for two weeks. (Tr. 438-53). The doctor noted it could be viral or related to Cushing's, and discharged her. (Tr. 440). A few days later, Plaintiff saw Dr. Nam and reported sharp right sided chest pain for one week. (Tr. 693). She stated it worsened after lifting her 30-pound son. *Id.* Plaintiff was concerned about her gallbladder. *Id.* Dr. Nam ordered an abdominal ultrasound (Tr. 694), which showed a fatty liver, but no other significant abnormality (Tr. 695).

*2012*

In April 2012, Plaintiff visited MedExpress in Pennsylvania complaining of sinus problems for two weeks with an intermittent fever and was diagnosed with acute sinusitis. (Tr. 322-23). Plaintiff returned to MedExpress in May 2012, and was diagnosed with bronchitis and sinusitis, and prescribed medication. (Tr. 320-21).

In June 2012, Plaintiff was taken to the Western Pennsylvania Hospital emergency room complaining of fever, radiating back pain, chills, and lightheadedness. (Tr. 326). She reported the symptoms developed after carrying her 35 pound two-year-old at the zoo. *Id.* Plaintiff was assessed with systemic inflammatory response syndrome and admitted for monitoring from June 13 to 18. (Tr. 326-42). Plaintiff's final diagnoses included pseudotumor cerebri and Cushing's syndrome. (Tr. 335). Plaintiff followed up with Dr. Nam who referred Plaintiff to an

endocrinology consult for her Cushing's, and an ophthalmology consult for her history of pseudotumor cerebri. (Tr. 696-97).

In July 2012, Plaintiff was admitted to Aultman Hospital for a headache and nausea (Tr. 395-432, 593-606), which improved after a lumbar puncture (Tr. 396, 425, 602).

Also in July 2012, Plaintiff saw Suzanne Harold, M.D., at Northeast Ohio Endocrinology, who diagnosed Cushing's Syndrome and Dysmetabolic Syndrome X, and ordered a variety of tests. (Tr. 682-84).

Later in July 2012, Dr. Nam diagnosed Plaintiff with bronchitis and ordered an antibiotic. (Tr. 703). A few days later, Plaintiff visited the emergency room complaining of heart palpitations, shortness of breath, and joint pain. (Tr. 377-90). Testing and lab work was largely normal, and Plaintiff was discharged. (Tr. 389).

Plaintiff returned to endocrinologist, Dr. Harold, in August 2012, who noted Plaintiff's cortisol test was high and continued to diagnose Cushing's Syndrome and Dysmetabolic Syndrome X. (Tr. 678-80).

Plaintiff also saw neurologist Timothy Hagen, D.O., at NeuroCare Center in August 2012 to evaluate headaches, neck stiffness, heart palpitations, nausea, blurred vision, lightheadedness with postural changes, and joint pain. (Tr. 589-92). Plaintiff's neurological examination was normal. (Tr. 591). Dr. Hagen restarted Diamox at half the dose Plaintiff had previously taken, which had caused side effects. *Id.* Plaintiff did not want to try a lumbar puncture again and Dr. Hagen noted "[t]he symptoms are very mild". *Id.*

Plaintiff returned to Dr. Nam in September 2012, complaining of two weeks of constant headache, made worse by forward bending. (Tr. 710-11). Dr. Nam assessed Cushing's Syndrome

and morbid obesity, suggested a low fat diet, exercise, and follow up with endocrinology and neurology as necessary. (Tr. 711).

Plaintiff returned to Dr. Harold in September 2012 for "potential Cushing's Syndrome". (Tr. 675-77). Plaintiff's salivary cortisol was significantly elevated and Dr. Harold noted she would refer Plaintiff back to the Cleveland Clinic. (Tr. 676).

In October 2012, Plaintiff reported to the Aultman emergency room complaining of itchy ears, nausea, and fatigue. (Tr. 766-77). The physician's impression was "consistent with some psoriasis" and Plaintiff was given a topical cream. (Tr. 766).

*2013*

In January 2013, Plaintiff saw Dr. Nam for a painful rash around her hairline and ears for three months, as well as pain in her left elbow and hips. (Tr. 717). Dr. Nam noted Plaintiff was scheduled for additional testing through the Cleveland Clinic and was instructed not to use any corticosteroids until her testing. *Id.* Dr. Nam noted areas of papular eruption on her skin, and referred Plaintiff to a dermatologist. (Tr. 719). He instructed her to follow up as scheduled with the Cleveland Clinic and ordered hip and pelvic x-rays, *id.*, which were normal (Tr. 769).

Plaintiff returned to Dr. Nam in March 2013, for her rash and joint pain in hands, elbows, and shoulders. (Tr. 784-86). She had been unable to see a dermatologist because of her health insurance. (Tr. 784). Examination revealed moderate tenderness to palpation in both hands, shoulders, and elbows, and a severe scalp rash and erythema. *Id.* Dr. Nam assessed arthralgia, rule-out psoriatic arthritis, rule-out sero-negative rheumatoid arthritis; skin rash with extensive erythematous eruption on scalp and few on the back ("psoriasis vs. seborrheic dermatitis"); and probable Cushing's Syndrome (noting Plaintiff had received conflicting endocrinologist opinions about this). (Tr. 785-86). Dr. Nam ordered a topical medication, instructed Plaintiff to follow up

8

with endocrinologist as scheduled, and referred her to a dermatologist who accepts her health insurance. (Tr. 786).

Plaintiff went to the emergency room at Sharon Regional Health System ("Sharon Regional") on March 10, 2013, complaining of body aches and fever. (Tr. 850-51). She stated her problem developed while driving from Canton, Ohio to Pennsylvania. (Tr. 850). She improved with Tylenol and fluids and was diagnosed with viral syndrome and released. (Tr. 851). Plaintiff returned to the emergency room the following day complaining of neck pain, stiff neck, back pain, and racing heart. (Tr. 836). Emergency room doctors offered a lumbar puncture to rule out her symptoms being related to her pseudotumor cerebri, but Plaintiff declined. *Id.* Plaintiff was given fluids and pain medication, diagnosed with viral syndrome, and released. (Tr. 837).

Dr. Nam evaluated Plaintiff in June 2013 for joint pain and rash. (Tr. 781-83). On examination, Dr. Nam noted mild tenderness to palpation in Plaintiff's elbows, wrists, hands, knees, and feet. (Tr. 782). He also noted moderate rash on her scalp and lower back, erythema, but no lesions. *Id.* Plaintiff was again referred to an endocrinologist and rheumatologist and Dr. Nam ordered x-rays of the feet, hands, shoulders, knees, and elbows. (Tr. 783).

Later in June, Plaintiff visited the Sharon Regional emergency room with a progressively worsening cough for two weeks. (Tr. 800). Her examination was noted to be "benign" and the doctors did not believe a chest x-ray was warranted. She was treated for bronchitis and released. (Tr. 800-01).

In July, Plaintiff again saw Dr. Nam and reported her coughing had continued, and seemed to worsen at night and with exertion. (Tr. 866). Dr. Nam continued Plaintiff's prior

diagnoses and added chronic obstructive asthma with acute exacerbation. (Tr. 868). A chest x-ray was normal. (Tr. 891).

In August 2013, Plaintiff went to the emergency room at St. Elizabeth Health Center ("St.Elizabeth") complaining of epigastric pain, nausea, and migraine headache. (Tr. 920). Plaintiff reported she had been taking naproxen for a few weeks for psoriatic arthritis. *Id.* Emergency room doctors suggested gastritis, likely related to naproxen use. (Tr. 922).

Plaintiff returned to St. Elizabeth in August 2013 complaining of a worsening headache. (Tr. 923). She had a normal head CT, improved, and was discharged. (Tr. 925-26).

In October 2013, Plaintiff saw dermatologist Rayna Dyck, M.D., at the Cleveland Clinic. (Tr. 994-95). Dr. Dyck ruled out psoriatic arthritis based on examination and imaging. (Tr. 994-95). Dr. Dyck noted an intermittent rash on Plaintiff's back, abdomen, and scalp, and that Plaintiff reported it also sometimes appeared other places. (Tr. 994). Dr. Dyck diagnosed psoriasis on approximately one percent of Plaintiff's body surface area and scalp sebopsoriasis, and prescribed topical treatments. (Tr. 995). Plaintiff's psoriasis was described by another clinician present as "mild." (Tr. 996).

Later in October, Plaintiff saw endocrinologist Karla Arce, M.D., at the Cleveland Clinic. (Tr. 875-80). Dr. Arce noted Plaintiff's extensive history of high and low cortisol readings, and associated symptoms. (Tr. 875). Plaintiff reported eating a gluten free diet and that she was "busy with the 2 year old with no time for exercise." *Id.* Plaintiff also reported being given topical hydrocortisone for her psoriasis "which she has not taken yet." (Tr. 879). Dr. Arce's notes also stated: "[w]alks, exercise classes." (Tr. 876). On examination, Dr. Arce noted moon face, mild psoriatic lesions, and a psoriatic patch on the lower back. (Tr. 879). In conclusion, Dr. Arce noted "extensive workup for [C]ushing's disease or syndrome without any conclusive

evidence and perhaps she should seek other means of lo[]sing weight such as strict diet and exercise program or bariatric surgery." *Id.*

In November 2013, Plaintiff visited the Aultman emergency room with complaints of bladder incontinence, abdominal pain, and back pain, but left before being seen. (Tr. 893-911) Later the same day, she went to the emergency room at Summa Akron City and St. Thomas Hospitals and was diagnosed with a "3 mm nonobstructing calculus in each kidney." (Tr. 948-50). The next day, Plaintiff followed up with Dr. Nam. (Tr. 913). He instructed Plaintiff to complete her course of antibiotics and referred Plaintiff to a gastroenterologist. (Tr. 915).

### *2014*

In February and March 2014, Plaintiff went to West Immediate Care at Aultman and was diagnosed with acute sinusitis, and given an antibiotic. (Tr. 946-47).

In April 2014, Plaintiff saw Dr. Nam to "express[] concern regarding testing recommended by the Cleveland Clinic Dept of Endocrinology." (Tr. 942). Dr. Nam prescribed Diflucan and instructed Plaintiff to suspend her use of topical steroid treatments. (Tr. 944).

In May 2014, Plaintiff returned to Aultman West Immediate Care reporting congestion and cough for five days. (Tr. 987). Plaintiff reported "that she does get frequent bronchitis that always responds on antibiotic." *Id.* The doctor diagnosed acute bronchitis, and prescribed an antibiotic. *Id.*

In June 2014, Plaintiff saw rheumatologist Carmen Gota, M.D., at the Cleveland Clinic for back pain. (Tr. 968-70). Dr. Gota noted Plaintiff's current prescriptions, including those for her psoriasis. (Tr. 968-69). Dr. Gota also noted she would send Plaintiff to a dermatologist and endocrinologist again. (Tr. 968). On examination, Dr. Gota noted Plaintiff had pain in the lower back with left hip rotation, but the rest of the examination was negative, including ability to

11

walk, get up on toes and heels, and normal reflexes. (Tr. 970). Dr. Gota ordered x-rays of the hip and lumbar areas, and referred Plaintiff for a spine consult. *Id.* The lumbar x-ray showed minimal degenerative changes in the lumbar spine, with disc space intact and the hip x-ray was normal. (Tr. 974-75; 1008).

Later in June 2014, Plaintiff was diagnosed with an upper respiratory infection and bronchitis at the Aultman emergency room. (Tr. 985-86). Her physical examination noted slight expiratory rhonchi and "no rash". (Tr. 985).

Later in June 2014, Plaintiff saw Tagreed Khalaf, M.D., at the Cleveland Clinic Center for Spine Health for lower back and left lower extremity pain. (Tr. 1006-08). Plaintiff reported "diffuse joint paint since the age of 17" and left side lower back pain for the previous four years, worse with lifting and bending. (Tr. 1006). On examination, Dr. Khalaf noted Plaintiff's gait, toe walking, and heel walking were normal; Plaintiff had normal bilateral upper and lower extremity strength; and peripheral joint range of motion was full and pain free in all four extremities. (Tr. 1007-08). Dr. Khalaf noted positive left SI provocative maneuvers and left PSIS tenderness. *Id.* He also noted a "possible psoriatic patch" on Plaintiff's lower back. *Id.* His conclusion was chronic lower back and left lower extremity pain, and that the left lower extremity pain "appears multifactorial-a component of SI joint pain and lumbrosacral neuritis." *Id.* He suggested a physical therapy trial. *Id.*

### Opinion Evidence

In September 2012, state agency physician Dr. Malika Hasque, M.D., opined Plaintiff could occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; stand or walk for six hours in an eight-hour work day; sit about six hours in an eight-hour work day; push or pull unlimitedly; frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and

frequently stoop, kneel, crouch, or crawl. (Tr. 89-91). Dr. Hasque opined Plaintiff could have unlimited exposure to extreme temperatures, wetness, humidity, noise, vibration, and fumes, but should avoid even moderate exposure to hazards. (Tr. 90).

In October 2012, psychological consultative examiner Robert Dallara, Ph.D., evaluated Plaintiff at the request of the state agency. (Tr. 613-17). Plaintiff reported inability to work based on increased intracranial pressure, headaches, and blurred vision. (Tr. 613). Regarding her daily activities, Plaintiff reported she gets up, takes care of her two-and-a-half year-old son, and does some household chores (including cooking, cleaning, and laundry). (Tr. 614). Dr. Dallara diagnosed anxiety disorder, and noted her anxiety might cause her difficulty related to others, or withstanding work pressure. (Tr. 617).

In February 2013, state agency physician Gary Hinzman, M.D. issued an opinion finding the same restrictions as Dr. Hasque. (Tr. 119-21).

In June 2014, Dr. Nam opined Plaintiff had some restrictions in lifting and carrying due to "[c]hronic joint pain in feet, elbows, shoulders, and hands." (Tr. 978). He opined Plaintiff could lift 10 pounds continuously, 11-20 pounds frequently, and 21-100 pounds occasionally. *Id.*[1] He opined Plaintiff had limitations in sitting, standing, and walking due to "[c]hronic arthralgia/arthritis, which seems to be inflammatory in nature; possibly psoriatic arthritis. Joint pain can be severe and has involved the hands, elbows, shoulders, and feet. Diagnostic workup is ongoing and involves the care of rheumatologists and endocrinologists. Flare ups have been frequent and severe." (Tr. 981). He opined Plaintiff could sit for three hours, stand for one hour, and walk for one hour at one time without interruption. (Tr. 979). He believed Plaintiff could sit

---

1. The form defines "continuously" as "more than two-thirds of the time"; "frequently" as "from one-third to two-thirds of the time"; and "occasionally" as "very little to one-third of the time." (Tr. 978).

for a total of six hours, stand for a total of one hour, and walk for a total of one hour in an eight-hour work day. *Id.* Dr. Nam opined Plaintiff could climb stairs and ramps frequently, but only occasionally climb ladders or scaffolds; balance, stoop, kneel, crouch or crawl. (Tr. 981). Regarding environmental limitations, Dr. Nam noted Plaintiff should not have "regular or frequent exposure to dust, fumes, or extremes in temperature" due to "a history of asthma" because these "could exacerbate her reactive airway disorder." (Tr. 982). Dr. Nam answered "yes" to whether Plaintiff could "perform activities like shopping", "travel without a companion for assistance", "walk a block at a reasonable pace on rough or uneven surfaces", "use standard public transportation", and "care for [her] personal hygiene". (Tr. 983). Dr. Nam checked a box indicating he would expect Plaintiff's "impairments or treatment" would cause her to be absent from work about four days per month. *Id.*

### *VE Testimony and ALJ Decision*

The ALJ asked the VE to consider a hypothetical individual who can perform sedentary work; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; must avoid hazards such as dangerous machinery and unprotected heights; cannot reach overhead with her left upper extremity; can frequently reach in other directions with both upper extremities; must avoid even moderate exposure to harsh chemicals; can understand, remember, and carry out simple instructions and perform simple routine tasks; can perform low stress work; can adjust to occasional changes in the work setting; and can have no face-to-face[2] job related contact with the public, but occasional interaction with coworkers. (Tr. 76-77). The VE stated such an individual would be able to

---

2. The ALJ first described this as "no contact" (Tr. 76), but later modified to face-to-face contact (Tr. 77).

perform work as a document preparer, mailing house worker, and secretarial work such as a call out operator. (Tr. 77-78).

In his second hypothetical, the ALJ modified to include three to four unscheduled work breaks of 20 to 30 minutes in an eight hour work day, and that the individual would have to leave work early three to four days per month. (Tr. 78). The VE stated no work would be available to such an individual with either or both restrictions. *Id.*

In his decision on August 1, 2014, the ALJ found Plaintiff had severe impairments of morbid obesity, pseudotumor cerebri, systemic inflammatory response syndrome, psoriasis, psoriatic rash, rotator cuff tear, and anxiety disorder; but these severe impairments did not meet or equal any listed impairment (Tr. 27-31). The ALJ concluded Plaintiff's RFC was consistent with the first hypothetical posed to the VE, and thus, since jobs were available, Plaintiff was not disabled. (Tr. 38-39).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

4.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

16

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred because he: 1) mischaracterized Plaintiff's hearing testimony, and 2) improperly evaluated the opinion of treating physician Dr. Nam. (Doc. 14). The Commissioner contends the ALJ reasonably evaluated both Plaintiff's testimony and Dr. Nam's opinion. (Doc. 17).

### Evaluation of Plaintiff's Testimony

Plaintiff contends the ALJ erred in his characterization of Plaintiff's testimony. (Doc. 14, at 20-21). Commissioner acknowledges Plaintiff's allegation "that she testified that she performed several activities, including caring for her son, with help from others" as "well-taken", but contends the ALJ's decision was reasonable and supported by substantial evidence. (Doc. 17, at 8). The undersigned agrees with the Commissioner.

Although the parties do not frame this as a credibility issue, the law regarding an ALJ's credibility analysis is instructive here. Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). In evaluating credibility of Plaintiff's complaints an ALJ considers certain factors such as daily activities; location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medication; other treatment; any measures used to relieve pain or

17

symptoms; and any other factors concerning limitations and restrictions due to pain. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

The ALJ here concluded Plaintiff's daily activities indicated she could do more than she alleged. (Tr. 36-37). Specifically, Plaintiff objects to the ALJ's conclusion that Plaintiff testified "she was the primary care provider of her young son". (Tr. 36 & 37). Plaintiff argues this misstates her testimony that she relied on her mother, sister, and child's father to help with activities, including the care of her son. *See* Tr. 68-72. The undersigned agrees with Plaintiff (as does the Commissioner) that this characterization of her testimony was not well articulated, however, the ALJ's ultimate conclusion—that Plaintiff was not as limited in her daily activities as she claimed—is supported by substantial evidence. In contrast to her testimony that she was extremely limited in her daily activities, the ALJ cited, at various places in his in his opinion:

1.  Plaintiff's August 2012 function report in which she stated she could dress and bathe without assistance, prepare simple frozen meals, or recipes with a few ingredients; do laundry, and pick up after herself; drive a car sometimes; grocery shop once a week; attend her son's music class twice a week; and watch television. (Tr. 30) (citing Tr. 254-61). This report also stated she takes care of her

two year old son "as much as [she is] able to" (Tr. 255), which she explained including "feeding and watching him, also reading to him" (Tr. 261).

2.  A statement in June 2011 that she was "chasing her fourteen-month old" (Tr. 32) (citing Tr. 966).

3.  A statement in September 2011 that she had attended a flea market. (Tr. 32) (citing Tr. 462).

4.  A statement in December 2011 that she was able to lift her 30-pound son. (Tr. 32) (citing Tr. 693).

5.  Plaintiff's report in June 2012 that she developed back pain and lightheadedness after spending the day at the zoo carrying her 35-pound two-year-old. (Tr. 33) (citing Tr. 326).

6.  Plaintiff's statement to a physician in November 2012 that she was "busy with a 2 year old with no time for exercise" (Tr. 34) (citing Tr. 875).

7.  Plaintiff's testimony that she would help her son with puzzles, coloring and writing his letters. (Tr. 36) (citing Tr. 68-69).

8.  Plaintiff's statements to Dr. Dallara, the consultative psychological examiner, that she cares for her 2-1/2-year-old son, does some cooking, cleaning and laundry and occasional grocery shopping. (Tr. 36-37) (citing Tr. 614).

9.  A statement from Plaintiff's father that Plaintiff could dress, bathe, prepare simple meals, do occasional laundry, read, watch television, shop in stores, use the computer, and care for her son. (Tr. 37) (citing Tr. 276-83).

Although Plaintiff is correct that there was also contradictory evidence in the record—including her testimony—suggesting she was more limited, the question is whether "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The ALJ noted Plaintiff's "treatment record did not support the assertion [] that she had chronic infections and fatigue that limited her ability to care for her son or perform daily activities." (Tr. 36). Here, although the ALJ could have been more artful in his wording, his conclusion that Plaintiff's self-reported activities at various points in time showed she was less limited than she claimed and was capable of sedentary work with restrictions, was supported by substantial evidence. Because

the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence the record", *Jones*, 336 F.3d at 476, the undersigned finds the ALJ did not err in this regard.

### *Treating Physician*

Plaintiff contends the ALJ erred in evaluating treating physician Dr. Nam's opinion. (Doc. 14, at 16-19). The Commissioner responds that the ALJ's decision is supported by substantial evidence. (Doc. 17, at 6).

This argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. §

416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence).

In June 2014, Dr. Nam opined Plaintiff had some restrictions in lifting and carrying due to "[c]hronic joint pain in feet, elbows, shoulders, and hands." (Tr. 978). He opined Plaintiff had limitations in sitting, standing, and walking due to "[c]hronic arthralgia/arthritis, which seems to be inflammatory in nature; possibly psoriatic arthritis. Joint pain can be severe and has involved the hands, elbows, shoulders, and feet. Diagnostic workup is ongoing and involves the care of rheumatologists and endocrinologists. Flare ups have been frequent and severe." (Tr. 981). Elsewhere in his opinion regarding environmental limitations, Dr. Nam notes Plaintiff should not have frequent—but only occasional—exposure to dust, fumes, or extremes in temperatures due

to "a history of asthma" because these "could exacerbate her reactive airway disorder." (Tr. 982).

On the final page of the assessment, Dr. Nam checked a box to indicate Plaintiff would be absent

from work about four days per month due to "impairments or treatment." (Tr. 983).

> After summarizing Dr. Nam's opinion, the ALJ stated:
>
> I give little weight to the opinion from Dr. Nam since it was not consistent with
> the record as a whole. In October 2013, the claimant received treatment from a
> dermatologist for her "mild psoriasis" [citing Tr. 993-1002]. However, after
> October 2013, the claimant did not return to the dermatologist for treatment of her
> psoriasis, which strongly suggests that her symptoms improved with treatment
> [citing Tr. 993-1002]. The claimant received only intermittent treatment for
> respiratory infections [citing Tr. 763-73; Tr. 798-865; Tr. 984-92]. Then in June
> 2014, the claimant had a physical examination that was normal. The treatment
> record did not support the assertion[] that she had chronic infections and fatigue
> that limited her ability to care for her son or perform daily activities [citing Tr.
> 1003-15].

(Tr. 36). The ALJ then proceeded to contrast Plaintiff's assertion of disabling symptoms with

evidence—as discussed above—of her daily activities. *Id.*

Preliminarily, the undersigned notes the ALJ—although stating he gave Dr. Nam's

opinion "little weight"—actually adopted many of Dr. Nam's work-related restrictions, while

rejecting the more stringent restrictions opined by the state agency physicians, Dr. Hasque and

Dr. Hinzman (Tr. 89-91, 119-21). For example, the ALJ limited Plaintiff to sedentary work,

consistent with Dr. Nam's opinion (Tr. 979), and inconsistent with Dr. Hasque's and Dr.

Hinzman's opinion that Plaintiff was capable of medium work and could stand or walk for six

hours in an eight-hour work day (Tr. 89-91, 119-121). Additionally, the ALJ imposed even more

stringent restrictions than Dr. Nam in some categories. *Compare* Tr. 981 (Dr. Nam's opinion that

Plaintiff could occasionally climb ladders, ropes, or scaffolds) *with* Tr. 31 (ALJ's RFC requires

no ladders, ropes, or scaffolds); *compare also* Tr. 982 (Dr. Nam's opinion that Plaintiff could

have occasional exposure to unprotected heights and frequent exposure to moving mechanical

parts) *with* Tr. 31 (ALJ's RFC requires no exposure to dangerous machinery or unprotected heights). Plaintiff therefore appears to be contesting only the ALJ's rejection of Dr. Nam's opinion that she would miss four days of work per month.[3]

Plaintiff contends the reasons listed by the ALJ—specifically infrequent treatment for psoriasis and intermittent treatment for respiratory infections—are not supported by the record. (Doc. 14, at 17-19). The Commissioner responds Dr. Nam's opinion was based entirely on Plaintiff's joint pain, rather than other factors. The Commissioner's point is well-taken. As discussed more below, Dr. Nam did not opine Plaintiff's respiratory infections or psoriasis would cause any work-related limitations not accounted for by the ALJ.[4]

The ALJ's reasoning for giving Dr. Nam's opinion "little weight", is therefore seemingly directly aimed at Dr. Nam's opinion about the number of days per month Plaintiff would miss work (even though Dr. Nam never stated in his opinion that Plaintiff's psoriasis or respiratory infections would create work-related limitations). The ALJ determined Dr. Nam's opinion was entitled to "little weight" because it was not consistent with the record in four ways: 1) Plaintiff's psoriasis seemingly improved with treatment; 2) Plaintiff received only intermittent treatment for respiratory infections; 3) a June 2014 physical examination was normal; and 4) the treatment record did not support the assertion that Plaintiff was so extremely limited in her daily activities. (Tr. 35). Thus, the question for the Court is whether these reasons satisfy the "good reasons" requirement and are supported by substantial evidence.

---

3. The VE testified leaving work early three to four days per month would preclude work at the posited RFC. (Tr. 78).
4. As noted in this regard, to the extent Dr. Nam opined Plaintiff's respiratory problems would cause environmental limitations, the ALJ actually included *more* limitations in his RFC than Dr. Nam opined. *Compare* Tr. 31 *with* Tr. 982.

First, as to Plaintiff's psoriasis treatment, the undersigned finds the ALJ's statement supported by substantial evidence. Plaintiff is correct that Dr. Nam cited Plaintiff's "chronic arthralgia/arthritis which seems to be inflammatory in nature; possibly psoriatic arthritis" in support of his opinion that, among other restrictions, Plaintiff would miss four days of work per month. *See* Tr. 979. Plaintiff takes issue with the ALJ's statement that she did not return to a dermatologist for treatment of her psoriasis after October 2013 "which strongly suggests that her symptoms improved with treatment." (Tr. 36). Plaintiff argues Dr. Nam treated her for psoriasis starting in 2011 and points to her July 2014 hearing testimony about her rash. (Doc. 14, at 18) (citing Tr. 59. 70-71). Although Plaintiff is correct that there are records to show ongoing treatment for her psoriasis after the date listed by the ALJ, *see* Tr. 968 (June 2014 suggestion from Dr. Gota that Plaintiff see a dermatologist and listing topical medications Plaintiff was using for psoriasis) and Tr. 942-44 (June 2014 treatment note from Dr. Nam suspending topical steroids and prescribing Diflucan), these, even combined with other record evidence, do not support Dr. Nam's assertion that Plaintiff would miss four days of work per month. The ALJ's conclusion that Dr. Nam's opinion was inconsistent with the record is also supported by the previous page of his decision, where the ALJ thoroughly summarized Plaintiff's records regarding her psoriasis treatment (Tr. 35), including that a physical examination in October 2013 showed only psoriatic rash on her back (Tr. 35) (citing Tr. 879). Finally, to the extent Dr. Nam's opinion was based on "possibl[e] psoriatic arthritis", this is also not consistent with the record. *See* Tr. 994-95 (notes from dermatologist Dr. Dyck finding no medical evidence of psoriatic (or inflammatory) arthritis based on examination and imaging).

Second, the undersigned also finds the ALJ's statement about Plaintiff's infection

treatment supported by substantial evidence. Again, as the Commissioner points out, no doctor, including Dr. Nam, opined Plaintiff's respiratory infections would impose work-related limitations. Plaintiff takes issue with the ALJ's characterization of her treatment for respiratory infections as "intermittent" and her chronic infections as not limiting her ability to perform daily activities. The record shows Plaintiff was treated for respiratory infections twice before 2010 (Tr. 560, 549-52), twice in 2010 (Tr. 531, 467-70), three times in 2011 (Tr. 458-61, 457, 438-53), three times in 2012 (Tr. 322-23, 320-21, 703), twice in 2013 (Tr. 800-01, 868), and four times in the first half of 2014 (Tr. 947, 946, 987, 985-86). During this time, Plaintiff was also treated for other infections, including urinary tract infections in July 2009 and October 2010 (Tr. 555, 504), a hospitalization for systemic inflammatory response syndrome in June 2012 (Tr. 326-42), and viral syndrome in March 2013 (Tr. 836-37). Although these records certainly show Plaintiff is prone to infection, the ALJ acknowledged Plaintiff's many diagnoses and treatments, and reasonably contrasted them with Plaintiff's other activities to conclude they did not show Plaintiff would miss four days of work per month. In the pages prior to his discussion of Dr. Nam's opinion, the ALJ noted Plaintiff's symptoms from her respiratory infections improved with treatment, citing, e.g., Plaintiff's own statement to a physician that her bronchitis always responds to an antibiotic. (Tr. 35) (citing Tr. 987).

Third, in his decision to give Dr. Nam's opinion "little weight", the ALJ noted Plaintiff's normal physical examination in June 2014. (Tr. 36; *see also* Tr. 970). In this exam, Dr. Gota noted Plaintiff "walks well, strength intact, can get up on toes and heels" and "reflexes normal" but "has pain in the low back with left hip rotation." (Tr. 970). The ALJ also cited, elsewhere in his opinion, a July 2012 normal physical examination by endocrinologist Dr. Harold (noting

"[w]alks with a normal gait"; "no swelling bilaterally"; "no tenderness bilaterally"). (Tr. 33) (citing Tr. 675). Additionally, imaging throughout this time period was largely normal. (Tr. 769, 917-18, 774-75, 830, 995, 1008). This provides substantial evidence for the ALJ's decision to discount Dr. Nam's opinion, especially because Dr. Nam's opinion was almost entirely founded on Plaintiff's joint pain.

Fourth, as discussed above regarding the ALJ's credibility analysis and discussion of Plaintiff's testimony, the ALJ's decision that "[t]he treatment record did not support the assertion[] that she had chronic infections and fatigue that limited her ability to care for her son or perform daily activities" (Tr. 36) was also supported by substantial evidence in the record.

Taken as a whole, the ALJ's decision regarding Dr. Nam is supported by substantial evidence. It articulates the "good reasons" required to discount Dr. Nam's opinion that Plaintiff would miss four days of work per month. The reasons given in this regard were "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. Although the ALJ only explicitly considered § 404.1527(d)'s consistency factor, his opinion implicitly addressed the supportability of Dr. Nam's opinion, and Dr. Nam's specialty (referring to him as Plaintiff's primary care provider). *See Francis*, 414 F. App'x at 804-05 (an "exhaustive factor by factor analysis" is not necessary); *Nelson*, 195 F. App'x at 470 (indirectly attacking both consistency and supportability is sufficient). As such, the undersigned finds the ALJ did not err in his evaluation of Dr. Nam's opinion.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).